Will the clerk please call the last case for the morning? 4-15-1203, Marla Jimerson. Counsel, you may proceed. May it please the court. Counsel, my name is Stephanie Shea Williams and I represent the petitioner in this matter, Marla Jimerson. We are here regarding the commission's decision that her injury did not arise out of and in the course of her employment. Just to give you a brief overview of the fact, she is employed at St. John's Hospital as a cook. She works part time and the setup of St. John's Hospital for employees is a little odd in that they have an employee parking lot on the corner of Mason and 9th Street. The employees, particularly employees that aren't physicians at St. John's Hospital, have to park in this parking lot. It is mandatory. She then has to make her way to an employee entrance, which is also mandatory. She has to pass through a gate, which requires an employee ID. She then has to, either an employee ID or she has to enter her employee number on the pin. She walks through the employee gate and then she has to check in with this badge. And then same routine checking out. She has to go through the employee entrance, through the employee gate, and then back to the employee only parking lot. Let me ask you this. Is it clear? I mean, the injuries that occurred were sustained on a public street. They did not occur on premises controlled by the company, right? Correct. Does that make a difference here? No, it does not. And the cases that I have cited, in my brief particularly, is that of Bomarito, Chemlik, and Ostermeyer. And I'd like to briefly go over why it's not relevant and why it has no impact on whether... Bomarito was a defect in the alley, in the area that the employees were required to cross because it was the exit they were forced to take. In your particular case, there was nothing wrong with the street. How do you distinguish this case from either Osborne or Hess? Your Honor, in regard to Bomarito, the court focused on the fact that it wasn't material, that there were four entrances and two alleyways to the parking lot, that the employee in Bomarito was forced to park on 7th Street, much like the employee here, and she was forced to take... But in Bomarito, there was a defect in the alley. There was something she had to cross that was defective. In your case, she's crossing the street. I understand, but I don't think that that's the key token issue of Bomarito. While she did have to go through an alleyway, and I agree with you that there were defects in the street that eventually led to her falling and hurting her ankle in Bomarito, the fact of the matter was that the core issue of this case was that she had to park in a specific spot and she had to get to a specific entrance as dictated by... Well, how is this different than Osborne? Assuming everything you say is absolutely accurate, let's talk about Osborne. Osborne, the employer owned the parking lot located across the street. Let's pin down the specific facts, not just in general, okay? You recognize that, right? Yes. Okay. Your client started out in a specific employee-owned parking lot, right? Yes. And Osborne, at the conclusion of the shift, same as your claimant, the claimant, Osborne, left the factory and was crossing the public street en route to the employee parking lot when she was struck by an automobile driven by a co-worker. The Supreme Court found the accident did not arise out of and in the course because, quote, the street where the injuries occurred were not under the control of the employer nor was the claimant acting at the direction of the employer when she crossed the street. How is it any different than your case? Even though she started out in the employer parking lot, she got hit crossing a public street, just like Osborne, the Supreme Court said, no recovery. Osborne did not focus, as Bomarito did, that the claimant was exposed to a risk greater, a common risk that is greater than the general public's common risk. And that's what differentiates Osborne is this argument and threshold that there needs to be a risk that is greater than that to the general public. The fact that Ms. Jimerson had to cross the road, whichever pathway she chose, she had to get from the employee parking lot to the employee entrance more than that of the general public. So why did she have to cross? You're trying to say that this is just like Bomarito where she had to be in the place that she was at. Why did she have to be in that position? Because she was required to park in the parking lot that she was. It would be one thing, there are closer parking lots. Those were reserved for physicians. Those were reserved for employees. If she would have gone, she could have gone and walked around to, and the appellee argued that she could have gone and walked to 9th and Carpenter. She could have gone and walked to 9th and Madison. The problem is that that would have been still a greater risk than the general public, no matter what route she chose. Why? Because if she would have walked to 9th and Carpenter, she would have had to walk two additional blocks. She would have had to walk past 9th and Reynolds. She then would have had to walk to 9th and Carpenter, crossed over, and then gone past routes that are emergency entrances for ambulance and other emergency personnel. She would have had to walk actually farther than walking across 9th and where she walked. Just walking farther doesn't increase risk. So, you know, here again, getting back to this question, did she have to be where she was? You talked about the employee gate. I couldn't tell from the satellite pictures whether or not there was a sidewalk leading directly up to the curb, such that it would encourage employees to cross mid-block in the direction or in the area where the employee was. What's the circumstance? Yes, there was, Your Honor. In fact, at the corner of 9th and Mason, which is where the employee parking lot is, Mason Street, which runs into 9th Street, has sidewalks, which would encourage, as you said, employees to then cross directly across 9th Street to the employee entrance, which was directly across the street. Well, which direction was she going? Was she coming from the hospital and going to the parking lot? Correct. Okay. So that's the area I'm talking about. Is there a sidewalk just outside the gate, the employee gate, leading to 9th Street? That, Your Honor, I'm not quite sure whether there's a sidewalk that dumps into 9th Street. I know that there is a sidewalk along 9th Street. There's certainly a pathway from the employee entrance to the sidewalk that abuts 9th Street. Whether there is a sidewalk next to that pathway, I'm unsure. But there is a pathway that leads to 9th Street in a sense that it leads to the sidewalk, which directly then is next to 9th Street. So in a sense, yes, you're right, Your Honor. There is a pathway which leads to 9th Street, which then she would cross and directly dumps into the sidewalk that is perpendicular to 9th Street on Mason Street. And this pathway is something which employees cross every single day. In fact, she was walking with employees at the time. There were employees at the parking lot. Was there anything defective about 9th Street? Other than the fact that there was not a marked crosswalk, which there should have been, no, Your Honor. So the risk that she was exposed to was the risk of getting hit by a car on a municipal street that she crossed? A street which she crossed more than the general public would have crossed. This is something that as an employee of St. John's Hospital, she was required to get to and from the employees. She crossed the street twice a day? Yes. How many streets do you cross in a day? It's not the crossing of the street. It's crossing that particular spot of the street. What was wrong with that particular spot of the street? There was nothing defective about the street itself, but that's not what needs to be proven here. What needs to be proven, as Chemlich and Oscar Meyer states, is that there is a regular and continued use of employees in crossing from one employee-designated area to another employee-designated area. Chemlich said that regular and continuous use, and talked about a mass and speedy exodus. As Oscar Meyer said, Chemlich did not hold that it's only quitting time when an employer is responsible for an accident arising. It's the regular and continuous use by the employee. In Chemlich, the employee was injured inside of an employee parking lot by a co-employee. That's something under the control of the employer. The street isn't under the control of the employer. But in Oscar Meyer, they were on the road. In Oscar Meyer, they were on a road, and it extended Chemlich's regular and continuous use of the employee from a parking lot,  When you say the regular use, in any case then, on your example, when somebody has to go in and out of the place of employment, right, both ways, every time somebody then under that scenario is hit by a car crossing the public street, they automatically recover because regular and continuous use is going in the building in the morning and leaving, according to you. Is that the rule we're supposed to announce? Well, when there is coming from an employer-controlled designated parking lot to an employer-controlled entrance, yes. If it was a circumstance in which they were allowed to park wherever they wanted and they could use whatever entrance that they wanted, then that would be one thing. But this was a parking lot and an entrance in which visitors – But you're leaving out the middle, which is clearly an Asborne and Hess. Both of those cases specifically talk about there's no liability because there's no evidence the complainant was using something under the control of the employer. Okay? If she got struck in the employer's parking lot, yes. Here they're saying the injuries occurred at a place that was not under the control of the employer. Both cases focus in on that issue, and that's your problem to overcome. I was crossing the street, as Justice Altman says, something that was under the control of the employer. Yes, but with Hess, who she was hit by was not an employee. And as in Oscar Meyer, the person – Hit by an employee? Correct. What does that have to do with it? Because even though she was not in an employer-controlled parking lot, she was hit by a co-employee who was immediately exiting. On a public street, not in the parking lot. And that's what differentiates it from Chenley. So I suppose under your theory, as long as she gets hit by a co-employee, it doesn't quite matter. As long as it's on the street somewhere, anywhere, it's recoverable. That is my argument, that she was going from – in a sense, it was employer-controlled all the way because she wouldn't have been crossing the street, but for the fact that she was going to work – Osborne, by the way, was a co-employee. She wouldn't have been – yes, I agree with you, Your Honor. Hess was not. Osborne was. She would not have crossed in that particular spot, but for the fact that she was mandated by the employer to park in an employee parking lot and go to an employee entrance. So I do understand that she was in a public street at the time. However, she was in her – I mean, she was going from one employee area to another. If the employer would have allowed her to park anywhere, to park in the physician lot, to park in the visitor lot, to go out a different entrance, then we wouldn't be here today. I understand your argument, Ms. Selma. You're saying the employer designated she park in a certain area, she had to park there. Had it not been for that requirement, she wouldn't have been crossing the street and wouldn't have been stopped by the cop. Yes, Your Honor. Now, whether or not that carries today is for us to decide, but I think we understand that. Thank you. Thank you, Counsel. Counsel, you may respond. And I'm sure Mr. Elwood agrees with that argument. Pardon me? Thank you, Brett Elwood on behalf of St. John's. Is this Osborne on all fours? I think it is, Your Honor, and I think the distinction that you're pointing out here is really the line that distinguishes our argument versus theirs and the cases that she cites versus the cases we cite. When you look at her line of authorities, Bomarito, Kemlich, Oscar Meyer, even the Brace case that was, I believe, cited in the reply brief, every one of those involves an accident or injury on the employer's premises. And that requires a completely different analysis than the line of cases of Reed, Osborne, Hess, and Warner that we cite, which are all cases that deal with coming and going and they're on a public street. And I think that's the distinction here that draws the line between her argument and our argument and why, as the Court has pointed out, the Reed, Osborne, Hess cases are controlling. I point the Court back to the way we opened our appellate brief. We pointed out that the case is governed by the coming and going doctrine that was elaborated on in Butler. And it says, when an employee is injured at a point off the employer's premises while traveling to and from work, the injuries are not compensable. And then it provides two exceptions. The exceptions are when the employee is present at a place where the accident occurs which was required in the performance of her job, which it was not, and she faced an increased risk versus that of the general public. Or second, the injuries occurred in a parking lot provided by and under the control of the employer. And Bomarito is actually a separate exception called the special hazard. That's a unique case because you've got a situation. They were forced out one place and immediately when they stepped out of the building, they encountered a defective condition that was enhanced by the unloading and loading and the bustle of the area that the employer created for its own benefit. We don't have anything like that here at all. You say Bomarito doesn't apply because the employees here could have gone in several different directions. They weren't channeled into one particular area. That's correct. Plus you don't have a defective condition like you had in Bomarito. That's correct. And counsel makes the argument that, well, I was required, a petitioner was required to park in a specific lot, but the only reason I would cite to Mr. Crump's testimony, as you notice, we didn't because there were some disputes about it. We really stayed away from it. But the only thing on the transfer page of 129, Crump has asked about the vehicles. He says vehicles are given IDs for where to park, but they're not lot specific. And that's why we've made the references to her being able to park in other locations. Now, she testified I regularly parked in that particular lot. Yes, she did, and that's in the record. But I think one thing that I noticed when I was looking at this case again for oral argument, and it's probably a little different than the argument expressed in my brief, because we did discuss the concept of increased risk, and the commission did as well. But when I reread each one of those cases, Reed, Osborne, Hess, Warner, they never got into an increased risk analysis. Oh, they didn't, did they? They turned down the employer not having control over the accident. Exactly. It was on a public street or a public sidewalk, and therefore, end of analysis. So I would say to that extent, we never even need to get to the increased risk analysis. Well, Osborne, they also said that it depends on whether there's a restriction by the employer. Well, and we don't have that. And I agree. If you had that, that would fall within one of the prongs of Butler, and we'd have a different bargain. And you would consider it. I completely agree with that. But again, we don't have that. So we're asking you to affirm. We think the law is very clear in this case. Thank you very much. Thank you, counsel. Counsel, you may reply. Counsel stated it best when citing that injuries can be compensable that occur off the employer's parking or premises when the presence is required in the performance of his or her duties. She was required to park in that lot. She was required to use that lot. But she was not required to cross the street where she crossed. Even if she would have crossed at a different crosswalk, there is still an increased risk in that she would be subjecting herself to still vehicles crossing, employees going in and out of the lot. She would have actually had to walk farther. She would have had to walk through other entrances, and she would have had to walk past emergency entrances for ambulances. There was no good way to get across from the employee parking lot to the employee entrance. St. John's Hospital, they need to do a better job of getting their employees over safely. Well, clearly she wouldn't have been exposed to this risk because this risk was her co-employee pulling out of the parking lot, turning right and striking her when she was outside the crosswalk. If your client had instead walked out of the employee gate, walked to the north to the stop intersection, crossed in the crosswalk there, and then traveled south on the sidewalk paralleling the east side of 9th Street, she never would have encountered the co-employee's car, would she? She could because there are multiple entrances to this employer parking lot. Now you're really getting into the area of speculation, aren't you? It would be speculation on my part to state that the same injury would have occurred. However, I think that it's important that no matter what path she took, it all led from one, the same specific spot, and was going to the same place, which was both mandated by her employer. It was at the direction of her employer to park at these specific entrances. And that's really this two-pronged test, which was in Parkside and Bomberito and in Oscar Meyer and other sorts. That wasn't discussed in Reed. It wasn't discussed in a lot of the different cases. I think that this two-pronged test is really the standard now in regard to the threshold of whether an off-premises injury is compensable. So in regard to Pelley's arguments that Reed is the case which should hold all, or Osborne is the case which should hold the weight here, those analyses were just not made in these cases. And newer cases, such as Bomberito, such as Oscar Meyer, such as Chemlik, did have those analyses. And those are the cases which should be the cases reviewed and given preference by this court. Thank you. Thank you, Counsel Polk. This matter will be taken under advisement and a written disposition shall be issued. Court will begin in recess until 9 a.m. tomorrow morning.